Okay, when everybody gets settled, we'll call the final argument case of the morning number 14408, oops, sorry, 1431010 that comes out of, for the sake of simplicity, Brumfield, United States of America, Louisiana State Board of Education. But you can all get yourselves organized. Good morning, may it please the Court, I'm Clint Bullock representing the appellants in this case. In the school year just completed, nearly 7,400 students out of more than 13,000 who applied were able to attend good schools as a result of the Louisiana Scholarship Program. Some of those children are with us here today. The question before this Court is whether a federal court has roving jurisdiction to apply a 40-year-old desegregation decree to an entirely new educational program that the government does not even allege to be discriminatory. The Supreme Court and this Court repeatedly have held that a federal court's jurisdiction is bound by the parameters of a constitutional violation and that a decree may not be extended to change circumstances. Is it correct to say that the Department of Justice agrees that there's been no violation of the consent decree? That is emphatically the case, Your Honor. That concession was made on page 25 of the government's brief and it states, and I quote, At this stage, the United States has not asserted that the voucher program either results in segregation in private schools or impairs desegregation in public schools. That is entirely the boundary of the district court's jurisdiction in the original case. Is that an issue of subject matter jurisdiction? Because of the strange procedural history where you got the right to intervene from our court, but it was too late, a couple days too late to be before the district court for the proceeding. You're in this 60 before motion to vacate posture, which as I read the authorities, you can vacate a judgment as being void only if there is a failure of either personal jurisdiction, which clearly Louisiana doesn't, there's no problem with that with the state of Louisiana, or subject matter jurisdiction. So are you saying that this case that's been pending for over 40 years doesn't have any federal question jurisdiction? It does not have jurisdiction over this program. It does continue to have jurisdiction over the program that was at issue in 1975. It seems to me you're saying, let me know if I'm characterizing this correctly, that the court exceeded its equitable powers, assuming this was a modification of the injunction which you argue. Let's assume that for a second. That the court exceeded its equitable powers in requiring disclosure related to this new program. That's exactly right, Your Honor. And is that a subject matter jurisdiction question? There seems to be a distinction in case law between, you know, diversity, what we all learned first year civ pro, right, subject matter jurisdiction is, is there diversity or federal question versus this whole other body of law on whether a court exceeds its equitable powers. Does that issue about the court's equitable powers go to subject matter jurisdiction? I believe it does, Your Honor. And it's not exactly clear, and I didn't do all that well in first year civ pro, but it's not exactly, it's not a fine line demarcation that's made in the cases, but in the cases that were decided under, under Rule 60b-4, they, particularly in the desegregation context, they do draw the line between matters that were at issue in the original desegregation case and matters that were sought to be added after. What's the case, the 60b-4 case involving this desegregation line? Well, I found very few cases in our circuit ever doing a 60b-4. It's not entirely clear. The closest factual analogy is the United States v. Texas case, and that appeared to be decided under Rule 59e, although the court refers specifically to jurisdiction in that decision. And it also looks like it may have been decided under Rule 60b-5, and we've tried to cover all of those cases in terms of the grounds for our requested relief. Why couldn't, why didn't you just file a straight notice of appeal? Because there was no injunction against the program. We do believe that this is an interlocutory appeal because it was a modification of prior orders in the case. But returning to the point about jurisdiction, that the court in U.S. v. Texas does refer to the decision there as being in excess of the court's jurisdiction, and I assume that certainly the court there was referring to subject matter jurisdiction. With regard to the threshold question that the Justice Department raised in terms of this court's jurisdiction to hear an interlocutory appeal, that appears to be quite clear. The Sierra Club decision of this court ruled that the question is whether the district court's order explicitly continued or refused to dissolve the existing injunction. An affirmative answer halts our inquiry and establishes our jurisdiction. There is no question that there have been injunctions in effect, and that the district court and the United States both understood this as being a modification of those earlier injunctions. And in fact, the remedy, the order that was issued with regard to the voucher program itself is an injunction because it requires that the data that is requested operate for all future years. Well, and in all other school cases. That's absolutely right, Your Honor. With regard to the Rule 60b-4 question, I think that the strongest, most clearly stated rule of law comes from the RUFO decision in the U.S. Supreme Court, and the rule of law established there was quite unequivocal. At page 389, the court holds that federal courts may not order states or local governments to undertake a course of action not tailored to curing a constitutional violation that has been adjudicated. Here a constitutional violation has not even been alleged, much less adjudicated. It's fair to say, is it not, that the Espinoza case did not decide as a matter of law that the arguable basis is sufficient to forward a 60b-4? That is absolutely correct. That's the government's argument here. It really is. It was dicta, the court went on to hold it, that a jurisdictional defect hadn't even been alleged there. And Judge Costa, to return it to your 60b-4 question, there of course is a second basis for jurisdiction under, or for relief under rule 60b-4, and that is due process. And here we think that the court started with the remedy as a means of potentially working back to the allegation, and that turns the promise of due process on its head. Turning to rule 60b-5. I understand your argument for why the court exceeded its jurisdiction is that Brumfield's about state aid to discriminatory schools, it was going on in the early 70s. It's not about desegregating the public schools, which are in all these separate cases littered throughout the state of Louisiana, district by district cases. But there is in the Brumfield, the 1975 decision, I think I have the year right, that talks, a lot of these districts, it talks about how the white flight was affecting the desegregation order. Now factually, we have the flip situation here, you have essentially a flight of African Americans from the public schools, because at least the data we have shows these scholarships are going very predominantly to African Americans. That's correct. So factually, whether it fits into that, but I mean, it does seem from that that Brumfield did have this, at least some concern with the effect of state aid to private schools on public school desegregation efforts. That, there's no question about it. But that was the factual setting in which this and in similar white segregation academy cases arose. But the court focused on the fact that these were segregation academies. And of course, the court's relief is entirely focused on that. In fact, the Justice Department is fond of quoting the language forbidding any type of of that remedy, which is, or the second part of that, which is any type of aid to segregated or discriminatory private schools. And here we have, you know, sometimes a court has to merely presume good faith on the part of the state, and certainly 30 years of compliance would establish that presumption under the law of the cases of this circuit. But you don't have to even presume it here. It's right in the law. What if the facts were different here and the voucher program was going 95 percent to white students? And so there was a showing that that was resegregating the public schools. Would the court have had jurisdiction there? Not unless there was a violation of the underlying decree. The Justice Department always . . . Only if they were going to schools that Exactly. Exactly. The Justice Department here is not without recourse. If it concludes that the program is discriminatory, which of course it would be a difficult conclusion to establish, it can file a new lawsuit. But then it has to prove discrimination as well it must, as well it should. Isn't there litigation going on in the state courts about this voucher program? Not to my knowledge, Your Honor. There was, and I believe that that was successfully resolved in favor of, ultimately in favor of the program. So the program is contained. It was? Okay. I'm pretty sure it was not involved in that particular litigation. I'll call it an injunction or modification of the injunction, as you call it, requiring the state to give up all this information. The state, I don't know if you know why the state's not appealing it, but they're not here. And not to bring you back again to procedure class, but one final question I have is I understand we allowed you to intervene, a decision one of my co-panelists wrote, on the view that, look, this litigation might lead to taking the vouchers away or it might lead to limiting the vouchers in some way. But here all we have is an order for the state to produce information. How does that give standing to your clients to appeal, given that they're not required right now to produce any information? Well, the trial court, basically it places these kids' educational opportunities at risk. In the order granting intervention, this court recognized that pursuant, once the court established jurisdiction over this program, it places the program at risk. The Justice Department clearly can at any time come forward to Well, more than that, it's asking for very close identification of every single kid who A, applies, and B, gets a scholarship. So the target is on their backs. And in fact, Judge Jones, not only that, but it asks information about kids. Once you're in the program, you don't have to reapply, and yet the state is still required annually to provide that information. But the key answer to your question, Judge Costa, is the provision in the court's final order, that if the state fails to comply, it may not issue scholarships. So if it accidentally messes up, whatever happens, this is automatic. And hence, the court's jurisdiction must be terminated in order to protect Without further hearing, there would That's exactly right. The language is in bold print in the order. And The state, they've already produced it for one year, right? I'm sorry? The stats were due for 2014-15. Yes. Yes. And so, so far, we do not have that. But in the court's final order, it requires that the state cease providing scholarships if the information is not provided in a timely fashion. I'll just take a quick word on Rule 60B-5. Assuming that this consent decree, that the court does have jurisdiction, it still should not apply it because of the dramatic changed factual circumstances and the changed law. In fact, in United States v. Texas, this court pointed to its previous decision in Samnerwood as an adequate legal change that justified 60B-5 relief. In terms of the changed facts, we have 30 years of compliance. The nature of the program has changed, and the beneficiaries have changed. Exactly what are you trying to vacate under 60B-5? The Brumfield original decree, the 85 decree, or the April order, the August, the 2014 order? Solely the April order. Okay. And with that, I look forward to seeing you again in a few minutes. All right. Thank you. Okay, Ms. Kwong. May it please the Court, my name is Teresa Kwong, and I represent the United States. Let me start by saying that the United States is not here to say that the voucher program is unlawful. We're not asking that the state alters voucher program. Well, if that's so, how can you have an order that says, if they don't comply with every tittle and jot of this annual disclosure requirement, that the voucher program must end? Granted that the district court did make statements that the state does need to produce the information about the voucher program in a timely fashion, the district court definitely expected that and required that if the United States found any violations with the voucher program, that we would need to come back to the district court and seek a motion for the appropriate relief and provide evidential support for any violations to support that relief. Why is there failure to comply with discovery when you don't know whether there's a violation, a town amount to the sanction for a violation itself? Well, that's exactly what we're here to do right now. We don't know what kind of data the state has about the voucher program, and we're asking for that data. We don't know if there's a violation, but we are obligated, in our view, under Brumfield to seek information from the state about state aid that's provided to schools that racially discriminate or state aid provided to private schools that impair desegregation in school districts that are under deseg plans. So why didn't you file your suit in each of those school districts? Because you would have known, essentially, how many kids would have left the school districts pursuant to vouchers. If that caused resegregation of the schools, which I can't even envision being a possibility, you could have filed suit under each of those consent decrees, could you not? That is correct, but we believe that we have- You preferred the global approach. We think that's more efficient. We think we're entitled to that information under Brumfield because of the two propositions that Brumfield stands for, which is the United States is- I don't see anything in Brumfield that stands as an operative matter for the proposition that the segregated effects around other schools have any compass within the consent decree that was issued. We understand that that's the intervener's position, that Brumfield stands only for the proposition that state aid cannot be provided to segregated private schools. However, in our view, the 1975 decision stands for two propositions, not just that state aid cannot be provided to private schools, but also that state aid cannot be provided to private schools. That would have the effect of impairing desegregation in public schools under deseg plans. I'd like to point out that the 1975 decision was very much concerned about the desegregation of public schools. In that original lawsuit, the plaintiffs were a class of African American students attending public schools throughout the state of Louisiana. It was a lawsuit not only against the state of Louisiana, but also the six public school districts in which the named plaintiffs attended public schools. Well, I'm looking at the injunctive order from 1975, and it enjoins the private schools from doing A, B, C, D, E. It doesn't enjoin the public schools from anything. That is correct if you look only at the order itself. Well, that's what they have to follow. You follow an order. You don't sort of conceive of the reasoning from the order. You follow an order, which is why it's an order. But it's not unusual to look at the court's decision to see the rationale for the court's order. All right. Okay, go on. And I would like to also point out that in 1975, the large number of students leaving the public school made it very obvious that their exodus from the public schools. Yeah, wasn't it ironic? Those were whites leaving to be away from black students, and now you are posing hurdles in the way of black students trying to get into integrated private schools. How ironic. Actually, at this stage, we're not there yet, and we may not ever get to that stage. Except for the fact that you have a self-destruct button in the district court's order, that if they do not comply with the discovery, the program ends. I don't think there is a self-destruct button in the order. If you look at the district court's order and also everything the district court said at the November hearing as well as the January hearing, the district court said, I am not prepared to stop the voucher program in any way. It is premature to do that, but what I am prepared to do is require the state to provide information so that the United States can evaluate the data about how the voucher program works. Where do you take this statement? I think this is what Mr. Bullock must have been referring to. The state shall take steps to ensure that one app does not send award notifications until the state has delivered the above information to the United States timely. And I don't read that as an automatic stop to the voucher program. In fact, it would be contrary to everything the district court had said, that the United States needs to review the data, needs to find a violation if there is one, and then come back to the court to seek the appropriate relief. Well, if we deny this appeal, we will hold you to that. But as structured, what it says is that since the state has to give pre-notification to DOJ, then DOJ could wait until the 10th day, which might be two days before the start of the school year or two days before the start of a new semester, and then on the 10th day come in and say, we object, this shows re-segregation, and guess what? You'd be off to the races on a hearing. I'll tell you what's been going on since the April order. The state who is not here on appeal, the state and the government, the United States, have been working cooperatively on getting the information about the voucher program. Right now, after three years in operation, we still don't have the necessary information that we need to make our determinations. But we're not going back to the court to seek relief. We are not seeking an automatic stop to the program. We are working cooperatively with the state. All you'd have to say is we don't have enough information yet, Judge Flamel. We need more information now. And then the whole program would be suspended while you were seeking information forever. We have not done that. No, but that's what the order says you could do. I don't think the United States does not read that order that way. Okay, well, just you're on record now. I'm sorry to have distracted you. Go on to whatever else. I'm perfectly happy to have that on the record. The district court seemed to have been under the impression, at least as I understand it, that it stated that the voucher program, when the court was discussing its jurisdiction here, it said that the voucher program assigned children to discriminatory private schools and violated the 85 consent order. But I gather that the Department of Justice disagrees with that and has said that you've never asserted that the voucher program results in segregation. We do not assert that the voucher program is unlawful at this stage because we're in the process of evaluating the data. I don't believe the district court made any finding that the voucher program violates the prior orders in this case. What the district court said was that he believed that he had subject matter jurisdiction over the voucher program because if it turns out that the state is implementing the voucher program in such a way that it results in segregated school systems, that that would be a violation of the prior orders in this case. But before we even get to the subject matter issue, we really need to decide, or you need to decide, on whether this court has appellate jurisdiction over this reporting. You're saying it's a discovery order, but discovery orders usually have a finite time period. This is indefinite. I understand the court might stop the disclosure at some point, but right now it's unlimited. Why doesn't that ongoing requirement make clear that it's a modification of an injunction rather than a discovery ruling? Well, I think perhaps a better way of characterizing this reporting order is that it is an order concerning the conduct of litigation within this case. The district court said, I am giving you this data, and you need to review the data and decide if there's a violation or not, and you need to come back and seek appropriate relief after you've had a chance to review the data and all the data that you need. And he probably did not put an end date in the actual order because we're in the process of trying to work out what information we need from the state. And he doesn't want to cut it off in, you know, three years, because perhaps during that three years' time the state still hasn't produced the information that the government needs. But the district court was very clear at the hearing that this is not going to be an indefinite exercise for the state to provide the information and that he really envisioned that probably after four years, after the state provides all the necessary information. Even that discovery order starts, let's produce the information for four years. I mean, a discovery order is 30 days, 60 days, give us the information. That is correct. This is not the typical discovery order. But it is an order like in Gulfstream and in Hamilton where it is an order concerning the conduct of litigation within this case. It isn't an order that— I don't know why they refer to it. I think in some instances when they talk about modification and what possible relief could be done in the future, they're just talking about the whole universe of possible action that could be taken. It just misspoke over and over again. The judge misspoke, the government misspoke, the pleadings misspoke, because up until the very last, you will not find the word discovery in any of these documents. I think perhaps that we shouldn't focus on the word discovery, but we should focus on what exactly is being ordered in the April order. It is that the state must provide information about the voucher program. That's all. It doesn't stop the state from doing anything with respect to the voucher program. It doesn't stop the awarding of vouchers. It doesn't affect the state's ability to implement the voucher program in any way. All it is is producing information about the voucher program so that the United States could review the data and see if there are any violations of the prior orders in this case. I mean, the April order does nothing more than move the case forward. That's exactly what the district court expected this order to do. But what is the case? Well, the voucher program— No, what is the case? What case are we moving forward? We're moving forward— I've never—I mean, you know, this is not like in an ordinary discovery where you might have a discovery to perpetuate evidence or perpetuate testimony before you've—which is very rare—before you've filed suit. This is a case where the government is obligated to ensure that state aid is not being provided to private schools that racially discriminate or state aid is not— I mean, I don't mean to be hyper-technical, but if this were private litigation and there was some kind of ongoing injunction between one party and another party, and after 10 years, which is unlikely, but after 10 years, the other party said, hey, we've got another trade secret violation here. What would a court do? It would say, so sue them. And you wouldn't—the court wouldn't reopen an ongoing consent decree and say, oh, yeah, well, you're entitled to discovery to find out under this previous decree to find out whether an entirely new trade secret is being violated. That's just not the way American courts work, is it? Well, the way—what this case concerns, it concerns state aid to private school. And what is the— No, it concerns state aid to students according to the Zobrist case. I disagree. It's vouchers to—well, I'm sorry, but the Supreme Court—I mean, how is this different from what the Supreme Court said in Zobrist? I believe that this case is different because it's about state aid to private schools. It's about vouchers provided to students to reimburse some of the costs of their attending private schools, and that's very similar to Zobrist, it seems. But that case was about school choice under the First Amendment, whether aid was going to— Is it Zelman? Is it Zelman? I'm sorry. The principal and scholarship. Yes. Zelman? Yes. Well, we're thinking the same way. Right. It's about Zs, sorry. Does this money go directly to the schools or to the students who then submit it to the school, the voucher? The money goes directly to the schools. The parents have a—can submit a preference, but they're not guaranteed that preference. The state decides which students are allowed into the program. The state decides which schools may participate in the program. The state places students in the private school, and the state provides the tuition directly to the private school. And just getting back to a question that the panel had about a state action, there was a state court action in the state Supreme Court where the court found that the funding mechanism that the state had in place for the voucher program was unconstitutional because the state was diverting funds that were supposed to be for public schools and using it to pay the private schools. Based on information I have from just my consultation with other attorneys at the Department of Justice, it appears that the state will be able to get around that decision by using a line item funding mechanism to fund the voucher program in the future. What's the DOJ position on whether these plaintiffs have standing to appeal this type of order? I think clearly they have the ability to appeal something, taking away the vouchers or modifying the plan. What about this order? That is an excellent question. As you pointed out, this case comes from a very unusual posture because the intervenors were not allowed to intervene until two days after the April order came down. Of course, this panel could decide that the intervenors don't have a direct personal stake in whether the April order should continue or not, and therefore the intervenors don't have standing to appeal the April order. And significantly, the state has not appealed. It would be unusual for this court to vacate an order that's directed. I mean, that would be jurisdictional, but you didn't argue that in your brief. Because of the unusual posture of this case, that is something that this court could find sui sponte. Another way to get to the same result is to find that the court doesn't have appellate jurisdiction. So that would just pretty much render this court's previous decision sort of nugatory, wouldn't it? The previous decision involving whether the intervenors have an interest in the ultimate outcome of the case is different from whether it has standing to try to vacate an April order that is directed only at the state, and the state is not appealing that order. It would be unusual for the court to find that an order that's directed only at the state where the state has not appealed somehow causes serious, perhaps irreparable consequences to the intervenors and would require direct, immediate review. Do you think that being left in uncertainty of this sort, semester after semester, about whether your children can attend the school that they've been allowed to attend, and one might add, editorially, be given the first real chance to succeed educationally in the Louisiana system, would be a very great burden on the students? Well, contrary to the intervenors' assertions, nothing prevents the intervenors from appealing and vindicating their interest if the district court at a later date issues an order resolving the claims on the merits or . . . So you don't think uncertainty weighs on anybody's interest? Well, at this stage, the government would need to review the data, see what the data shows, and then go back to the district court to seek the appropriate relief. We may not get there, but as the district court said, after the state produces the necessary data, the data may help the state or it may not. We don't know. The United States doesn't know what the data is going to show, but we are obligated under Brumfield to find out how this program works. When you were answering Judge Costa's question about jurisdiction, you went through the various possibilities. I never actually heard you say, but I may have missed it, what the Department of Justice's position is on appellate jurisdiction. Is it your position that there is no appellate jurisdiction? That is our position because we believe this is an order that just moves the case forward. It's just . . . it allows the government to review the data and see if we need to go back to the court to seek appropriate relief. And the Supreme Court and this Court have said that such orders are not appealable injunctions, even if the order itself is phrased in injunctive terms. If this Court finds appellate jurisdiction here, every time a Court changes the reporting obligations in a consent decree case, that decision is going to be immediately appealable. Yes, you're right. You're right. I mean, some of us have sat on some of these school desegregation decrees. And because, for whatever reason, the entities subject to those decrees have never chosen to modify them every few years or so, somebody comes in with some new case, and yes, we have jurisdiction over all of them. In fact, in one, within the last 12 months, we held that the, you know, a violation of a decree had occurred about 40 years after the fact, or else, you know, trial had to go forward. So these things are forever, which is indicated by the fact that you're seeking discovery forever, for four years. We're not seeking discovery about the voucher program forever, granted that the Brumfield certification has been on the books for 40 years. No, but you said that your— The voucher program has not. It's been in effect for three years, has it not? That is correct. And you said that this order could go on for four years, right? If, during that time, the State provides the necessary information that the government needs, and it has not, but the State and the United States have been working cooperatively to try to get that information. We have tried to do it outside of court. So if it turns—it's not in the United States' interest to continue this indefinitely. We would like to get the data so that we can review it and see if it complies with the prior orders in this case. If it turns out that it does, it's in our interest, and we were told by the district court that this needs to stop at some point, that it is in our interest to put an end to this. But what we need to do is to have the appropriate data, the necessary data, have time to review it over a period of time, a reasonable period of time, to see what patterns there are and whether those patterns in the operation of the voucher program either shows that state aid is being provided to schools, private schools that racially discriminate, or that it impairs the desegregation of public schools that are under desegregation plans. Okay, we have your argument. Thank you. Thank you. Mr. Bolick? Thank you, Judge Jones. Just a few final comments. I wish that we could hold the Justice Department's assurances at face value, but the order on its face operates in perpetuity. And in fact, the judge has repeatedly shown an inclination to be quite willing to enjoin the vouchers. He said, at record of on appeal 1011, he said, however, it will not prejudice the existing order to allow the state's voucher program to proceed while the United States assesses whether student assignments violate the orders issued in this case, provided the state fully and timely produces the requested information. Later at record on appeal 1227, he said, I'm not going to kick kids out of the school right now. So this is an omnipresent threat. Judge Jones, Zobris was actually a predecessor case to Zellman and pretty much held the exact same thing. Whatever. The program at issue in Zellman also had direct payments to the schools as a consequence of individual parental choice. That is exactly how the program here operates. The Supreme Court in Horn observed that the state often does not contest decrees that exceed the court's jurisdiction. Here, we believe the kids have more at stake than the state. The state has administrative burdens. The kids have potential loss of the only good educational opportunities they've ever had. And moreover, the admonition in Rufo and in Shelby County that these things cannot go on forever as a matter of federalism. We have standing under Bond versus United States, even if the state is absent, to challenge those federalism violations. The orders- But you're not under 60 v. 5. I think you answered this earlier. You're not trying to do away with the whole- That's correct. The certification process. That's correct. That's correct. In fact, we couldn't because it's part of the statute anyway. The orders below have sustained place-at-risk education reforms in states all over the country that still have ongoing desegregation decrees, even if those orders are moribund, and even if the beneficiaries of the educational reforms are also the intended beneficiaries of the desegregation orders. That is precisely the perverse consequence of the orders in this case, which turn the promise of opportunity on its head. The point of Brown versus Board of Education was to achieve equal educational opportunities for all kids, regardless of race. The point of this program is to achieve educational opportunities for all kids, regardless of race. We ask this court to remove the yoke of federal control from this program. Thank you very much. Thank you. We'll be in recess until 9 o'clock tomorrow morning.